NEW YORK STATE TEAMSTERS CONFERENCE PENSION & RE-TIREMENT FUND, New York State Teamsters Council Health & Hospital Fund, J. Dawson Cunningham, Frank Posato, Thomas Goodwin, Brian Mas-terson, John Bulgaro, Anthony Si-moes, Daniel Schmidt and Don Little, Plaintiffs,

v.

**UNITED PARCEL SERVICE, INC., Defendant.**

**No. 5:98–CV–1902 FJS/FLS.**

United States District Court,
N.D. New York.

April 9, 2002.

190

Morgan, Lewis & Bockius, LLP, Washington, D.C. (Jonathan G. Rose, of coun-

sel), Hancock & Estabrook, LLP, Syracuse, New York (Michael J. Sciotti, of counsel), for plaintiffs.

Pitney, Hardin, Kipp & Szuch, LLP, Morristown, New Jersey (Glenn E. Butash, of counsel), The Brett Law Firm, LLC, Syracuse, New York (Thomas Brett, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

## I. INTRODUCTION

Plaintiffs New York State Teamsters Conference Pension and Retirement Fund ("Pension Fund") and New York State Teamsters Council Health and Hospital Fund ("Health Fund") (collectively "the Funds") commenced this action pursuant to § 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1145.[1] The Funds sought an Order requiring Defendant United Parcel Service, Inc. ("UPS") to pay all delinquent contributions including liquidated damages and interest. Additionally, the Funds sought an Order requiring UPS to execute Participation Agreements for the period August 1, 1993 to the present, which UPS has failed to execute. UPS answered and asserted a counterclaim, which sought credit for alleged overpayments it had made to the Funds.

From June 4 through June 8, 2001, the Court conducted a bench trial in this action in which the Funds sought delinquent contributions for UPS's alleged underpayment to the Funds for the period of August 1, 1990 through December 31, 1994.[2] Based upon the evidence adduced at trial, the following constitutes the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## II. DISCUSSION[3]

### A. Findings of Fact

The Funds were created and exist pursuant to Agreements and Declarations of Trusts ("Trust Agreements"), which are entered into between participating employers and union locals affiliated with the International Brotherhood of Teamsters, A.F.L.—C.I.O. ("Teamsters"). *See* Joint Pretrial Stipulations at "Facts Not in Dispute" at ¶ 1. A Board of Trustees manages the Funds. *See id.* at ¶ 4. The Funds provide pension, hospital, medical, dental, death and disability benefits to qualified participants who satisfy the applicable eligibility requirements. *See id.*

Local unions affiliated with the Teamsters represent many of UPS's 340,000 employees. *See id.* at ¶ 6. UPS's upstate New York operations are centered in two distribution "hubs"—the Upstate New York District, which is centered in Syra-

---

1. Civil enforcement of ERISA is permitted pursuant to 29 U.S.C. § 1132.

2. Plaintiffs originally sought contributions for the period of January 1, 1989 through December 31, 1994. However, at the summary judgment stage of this case, the Funds' counsel acknowledged that the Funds were only seeking contributions for the period of August 1, 1990 through December 31, 1994. *See* Transcript of Motion Argument, held October 11, 2000, at 18; *see also* Joint Pretrial Stipulations at "Facts Not in Dispute" at ¶ 22.

3. Throughout this discussion, the Court will refer to the Funds' exhibits as "P-x" with "x" referring to the number of the exhibit. Likewise, the Court will refer to UPS's exhibits as "D-x" with "x" referring to the number of the exhibit. In addition, the Court will refer to the transcript of the trial as "Tr. x" with "x" referring to the page number of the transcript, followed by the name of the witness.

cuse, and the West New York District, which is centered in Buffalo. *See id.* at ¶ 8. UPS makes contributions on behalf of approximately 3,200 employees in the Upstate New York District and approximately 1,800 employees in the West New York District. *See id.* at ¶ 9. UPS and the Teamsters have most recently entered into collective bargaining agreements ("CBA") for the periods of 1987–1990, 1990–1993, 1993–1997 and 1997–2002. *See id.* at ¶ 10.

In 1989, the Funds and UPS executed Settlement Agreements relating to the Health and Pension Funds (collectively "1989 Settlement Agreement"), which settled a dispute between the parties concerning contributions for the period of January 1, 1975 through December 31, 1986.[4] *See id.* at ¶¶ 15, 17; P–11, P–12. Thereafter, the Teamsters and UPS executed an amendment to the 1987–1990 United Parcel Service Upstate New York District Supplemental Agreement ("1989 Amendment"). *See* Joint Pretrial Stipulations at "Facts Not in Dispute" at ¶ 11.

On March 25, 1993, the Funds and UPS executed another set of Settlement Agreements relating to the Health and Pension Funds (collectively "1993 Settlement Agreement"), which settled a dispute covering the period of January 1, 1987 through December 31, 1988. *See id.* at ¶¶ 18–19.

UPS has not signed any Participation Agreements for the contract periods of August 1, 1993 through July 31, 1997 or thereafter. *See id.* at ¶ 14. Pursuant to the CBA, UPS is contractually obligated to sign such Participation Agreements. *See* P–8 (1990–1993 CBA) at Article 60, Section 2; P–9 (1993–1997 CBA) at Article 61, Section 2.

During the period of May 1995 through April 1997, the Funds conducted an audit of UPS's books and records. *See* Joint Pretrial Stipulations at "Facts Not in Dispute" at ¶ 20. Based upon that audit, the Funds claimed that UPS owed $2,878,506.10 to the Pension Fund and $457,008.95 to the Health Fund in delinquent contributions and statutory penalties for the period of January 1, 1989 through December 31, 1994.[5] *See id.* at ¶ 21. Specifically, the Funds contend that UPS owes contributions with respect to the following categories (1) overtime, (2) unused sick leave, (3) holidays and roving holidays, (4) vacations, (5) sick leave, (6) workers compensation and disability, (7) orientation, and (8) jury duty, funeral leave and military leave. As discussed below, UPS denies that it owes the Funds any additional contributions and, in addition, contends that it has made overpayments in some of these categories and, therefore, seeks reimbursement for those alleged overpayments.

## B. Conclusions of Law

### 1. *Overtime*

The Funds assert that there is no eight-hours-per-day cap on UPS's contribution obligations but rather that there is only a weekly and yearly cap. Therefore, the Funds assert that UPS is obligated to make contributions for up to forty hours per week and 2,080 hours per year for

---

4. The Settlement Agreement relating to the Pension Fund was entered into on May 31, 1989, *see* P–11, and the Settlement Agreement relating to the Health Fund was entered into on July 6, 1989. *See* P–12.

5. As noted above, the 1989 Settlement Agreement applies to the period of January 1, 1989 through July 31, 1990 and thereby reduces the Funds' claims against UPS. *See* Joint Pretrial Stipulations at "Facts Not in Dispute" at ¶ 22.

each bargaining unit employee.[6] To the contrary, UPS contends that an eight-hours-per-day cap exists and, thus, contributions assessed for hours worked in excess of eight hours per day are improper.

The question of whether an eight-hours-per-day cap applies to UPS's contribution obligations during the audit period at issue (August 1990–December 1994) can only be answered by reference to the history of the contractual relationship between the Funds, UPS and, to some extent, the Teamsters. Therefore, the Court will begin its discussion of this issue by reviewing the terms of the documents the parties introduced at trial, starting with the 1979–1982 CBA.

### a. The parties' contracting history

The 1979–1982 CBA explicitly provided for an eight-hours-per-day cap. *See* P–91 (1979–1982 CBA) at Article 56 ("Effective 5/1/79, the Employer agrees to contribute the sum of $1.025 per hour paid to any and all of his employees covered by this Agreement but not to exceed **a maximum of eight (8) hours per day** or forty (40) hours per week, $41.00." (emphasis added)). This eight-hours-per-day cap, however, was not explicitly included in subsequent CBAs; for example, the CBA, which covered the period of May 1, 1982 through June 1, 1985, provided that "[e]ffective April 1, 1982, the Employer agrees to contribute the sum of seventy-seven and one half cents ($.77½) per hour paid to any and all of its employees covered by this Agreement, but not to exceed thirty one dollars

($31.00) per week." *See* P–92 (1982–1985 CBA) at Article 56.[7]

In 1987 the Teamsters proposed a change to Article 61 of the CBA, which would have provided that the "employer [is] to make contributions on all hours worked and/or paid, including overtime and shall increase contribution rates $.50 per hour per year." *See* D–7. However, that proposal was subsequently withdrawn, and Article 61 of the 1987–1990 CBA provided that "[e]ffective August 1, 1987, the Employer agrees to contribute the sum of seventy-seven and one half cents ($.77½) per hour paid to any and all of its employees covered by this Agreement, but not to exceed thirty-one dollars ($31.00) per week...." *See* P–7 (1987–1990 CBA) at Article 61, Section 1.

Then, in 1989, UPS and the Funds entered into a Settlement Agreement, which provided, in pertinent part, that "it is agreed that [UPS] is not obligated to make contributions for any hour paid to an employee in excess of either **eight hours per day** or forty hours per week." *See* P–11 (1989 Settlement Agreement) at ¶ 5 (emphasis added). Subsequently, UPS and the Teamsters signed the 1989 Amendment, which amended Article 61, Section 1 of the 1987–1990 CBA to read, in pertinent part, that "[e]ffective August 1, 1987, the Employer agrees to contribute the sum of $2.755 per hour to any and all of its employees covered by this Agreement, but not to exceed **a maximum of eight (8) hours per day** or forty hours per week,

---

**6.** For the audit period at issue, contributions to the Health Fund were based upon a weekly rate (for full-time employees) or a daily rate (for part-time employees). Therefore, the dispute concerning overtime hours (i.e., the eight-hours-per-day cap) only impacts the Pension Fund. *See* UPS's Proposed Findings of Fact and Conclusions of Law ("Post–Trial Brief") at "Proposed Findings of Fact" at ¶ 6.

**7.** Thomas Goodwin, a member of the Teamsters' negotiating committee, testified that he did not know why the eight-hours-per-day cap was omitted from the 1982–1985 CBA. *See* Trial Tr. at 203–04, T. Goodwin.

$110.20." [8] *See* P–13 (1989 Amendment) at ¶ 1 (emphasis added).

Despite the language of the 1989 Settlement Agreement and the 1989 Amendment, the eight-hours-per-day cap was not explicitly included in subsequent CBAs.[9] In particular the 1990–1993 CBA provides, in pertinent part, that "[e]ffective August 1, 1990, the Employer agrees to contribute the sum of three dollars and fifty and one half cents ($3.505) per hour paid to any and all of its employees covered by this Agreement, **but not to exceed one hundred forty dollars and twenty cents ($140.20) per week.**" *See* P–8 (1990–1993 CBA) at Article 61, Section 1 (emphasis added). Moreover, in both 1993 and 1997, the Teamsters again proposed changes to Article 63 of the CBA which would have obligated UPS to make contributions on all hours worked, including overtime, with no maximum hours. *See* D–12 at UPS678; P–62 at UPS088. These proposals, however, were subsequently withdrawn.

UPS asserts that the 1989 Amendment to the 1987–1990 CBA was carried forward into all subsequent CBAs and that, therefore, an eight-hours-per-day cap applies to its contribution obligations for the audit period at issue. To support this contention, UPS points to Article 42 of the CBA, the duration clause, which provides, in pertinent part, that

> Where no such cancellation or termination notice is served [pursuant to Section 1] and the parties desire to continue said Agreement but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a notice at least sixty (60) days prior to July 31, 1990 or July 31st of any subsequent contract year, advising that such party desires to revise or change terms or conditions of such Agreement.

*See* P–7 (1987–1990 CBA) at Article 42, Section 2.

UPS also contends that Article 42, Section 3, which provides that any revisions become effective as of August 1st of the subsequent contract year, *see* P–7, only sets the date that revisions become effective because those terms that are not revised continue to be part of the CBA. *See* UPS's Post–Trial Brief at 12 at ¶ 29.

Moreover, UPS claims that the fact that the Teamsters proposed a change to Article 56 in 1987 and to Article 63 in 1993, both of which would have obligated UPS to make contributions for all hours worked, including overtime, with no maximum hours, demonstrates that both parties recognized that an eight-hours-per-day cap existed at the time of their negotiations; otherwise, according to UPS, there would have been no need for these proposals.

At trial, former District Labor Relations Manager for the Upstate New York District, Jack Pridell, testified that "the chairman, Mr. Mackey, made the proposal that we contribute for all hours, meaning over eight hours a day, meaning over 40

---

8. On the last day of trial, the Court allowed Lawrence Tully, UPS's witness, to make a proffer regarding an alleged conversation he had with Peter Paravati, Sr., in connection with the negotiation of the 1989 Settlement Agreement. The Funds objected to this proffer as hearsay. The Court permitted the parties to address this issue in their post-trial submissions. However, the Court need not decide whether or not this testimony is admissible because the Court has not relied upon that testimony in reaching its conclusions regarding UPS's contribution obligations for the audit period at issue in this case.

9. According to Lawrence Tully, the attorney who represented UPS during the negotiations leading to the formation of the 1989 Settlement Agreement and the 1989 Amendment, the omission of the eight-hours-per-day cap in subsequent CBAs was "inadvertent." *See* Trial Tr. at 712, L. Tully.

hours a week[.]" *See* Trial Tr. at 293, J. Pridell. Pridell further stated that during the negotiations, "Mr. Mackey was talking about going over the eight hour pay per day and 40 hours per week and that's what their proposal was." *See* Trial Tr. at 296, J. Pridell; *see also* Trial Tr. at 363, J. Scanlon ("Bill Mackey explained all their proposals to us, when he got to the pension proposal, they were asking to pay all hours, he explained that, and said that they were looking for all hours, over 40, over eight, whenever we paid somebody, they wanted to—us to make a contribution.").[10] When asked about this 1993 proposal at trial, Paul Bush, who is the Director of Operations and Mergers and Acquisitions for the Funds and a former member of the Teamsters' negotiating committee with UPS, stated that "[t]he negotiating committee was seeking [that] this employer pay on all hours paid, that there would be no max, as I think—example of a fellow who works 13 hours on that day, you pay 13 hours; you work 1300 hours that week, you pay on all hours paid, and that included the vacation, et cetera, et cetera." *See* Trial Tr. at 646–47, P. Bush.

To the contrary, the Funds assert that the 1989 Amendment expired on July 31, 1990, the same date that the CBA in effect at the time that the parties executed the 1989 Amendment was scheduled to expire. *See* P–7 (1987–1990 CBA); P–13 (1989 Amendment). To support this contention, they point to the language of the 1989 Amendment itself, which provides, in pertinent part,

Article 61, Section 1 of the Agreement shall read as follows, effective August 1, 1987 through July 31, 1990, in lieu of the current printed version of said section: "Section 1: Effective August 1, 1987, the Employer agrees to contribute the sum of $2.755 per hour paid to any and all of its employees covered by this Agreement, but not to exceed a maximum of eight (8) hours per day or forty (40) hours per week, $110.20...."

*See* P–13 (1989 Amendment).

The Funds also note that UPS and the Teamsters engaged in extensive contract negotiations, which culminated in a new CBA in 1990 and, thus, presumably either one or both of those parties provided acceptable notice regarding their desire to amend the 1987–1990 CBA. Therefore, the Funds assert that, under the express terms of Article 42, Section 4 of the CBA, the 1987–1990 CBA expired sixty-one days after that notice was given. *See* Funds' Post–Trial Brief at 8–9 (quoting P–7 at 55, Article 42, Section 4 (providing that "[i]f notice is given in accordance with the provisions of this Section, the expiration date of this Agreement shall be the sixty-first (61st) day following such notice.")). Thus, the Funds urge that " 'there is no ground whatever for considering that the old agreement [or in this case, the old Amendment] still governs the relationship of the parties.' " *See id.* at 9 (quoting *Procter & Gamble Ind. Union v. Procter & Gamble Mfg. Co.*, 312 F.2d 181, 184 (2d Cir.1962)).

In addition, the Funds point to the fact that when negotiating the 1990, 1993 and 1997 CBAs, the Teamsters' and UPS's "side-by-sides" contained the original language for Article 61 (later Article 63), which is the provision of the CBA that relates to pension contributions, as op-

---

**10.** In addition, when asked at trial whether he believed that the eight-hours-per-day cap applied for the period of 1990–1993, Pridell responded, "Yes." *See* Trial Tr. at 270, J. Pridell. Likewise, when asked whether he believed that UPS had an eight-hours-per-day cap on its contribution obligations, Scanlon responded, "Yes, I do." *See* Trial Tr. at 333, J. Scanlon.

posed to the language contained in the 1989 Amendment. *See* P–75. Furthermore, the Funds note that, when negotiating and executing subsequent CBAs, UPS failed to include the eight-hours-per-day cap. According to the Funds, this lends credence to their argument that the parties never intended the cap to apply beyond the expiration date of the 1987–1990 CBA. Moreover, even after learning about the audit relating to this dispute and the fact that the Funds were seeking contributions for hours worked over eight hours per day, UPS still failed to address the issue during the 1997 collective bargaining negotiations.[11]

Finally, in response to UPS's argument that the Teamsters would not have proposed amendments to the CBA that sought pay for all hours, including those in excess of eight hours per day and forty hours per week, unless the eight-hours-per-day cap had been in place, the Funds assert that in making these proposals the Teamsters merely sought to increase the amount of benefits received by its members and wanted contributions on all hours paid; i.e., contributions for hours worked in excess of the forty-hours-per-week maximum. In support of this assertion, Thomas Goodwin, former President of Teamsters Local 317, testified that the Teamsters sought contributions for all hours paid "[b]ecause a lot of the full-time employees at [UPS] work more than 40 hours a week, . . ." *See* Trial Tr. at 168, T. Goodwin. In addition, Kenneth Stilwell testified that "[t]here is . . . no participating employer that has any hour-per-day cap." *See* Trial Tr. at 57, K. Stilwell.

█ "[C]ollective-bargaining agreements may include implied, as well as ex-

press, terms." *Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n,* 491 U.S. 299, 311, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (citation omitted). Likewise, it is well-settled that "the parties' 'practice, usage and custom' is of significance in interpreting their agreement." *Id.* (citation omitted). As the Supreme Court reiterated in *Ry. Labor Executives' Ass'n,*

"[a] collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. '. . . [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.' "

*Id.* at 311–12, 109 S.Ct. 2477 (quoting [*Transportation–Communication Emp. Union v. Union Pacific R. Co.,* 385 U.S.] at 160–161, 87 S.Ct. at 371 (citation omitted) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. at 578–579, 80 S.Ct. at 1350–1351)).

█ Even if a collective bargaining agreement is different from the ordinary commercial contract, "[h]owever, traditional rules of contractual interpretation are applied so long as their application is consistent with federal labor policies." *Int'l Org. of Masters, Mates & Pilots v. Victory Carriers, Inc.,* No. 84 Civ. 7073, 1985 WL 514, *2 (S.D.N.Y. Apr. 19, 1985) (citation omitted). Thus, if the agreement is unambiguous, the court is not free to consider the practice, usage and custom applicable to such agreements. *See id.* at *3 (citation

---

**11.** At trial, former UPS Labor Relations Manager John Scanlon acknowledged that he was aware that UPS had been assessed for contributions for hours worked in excess of eight hours per day. However, he explained that he did not raise the issue because he knew that UPS had the eight-hours-per-day cap. *See* Trial Tr. at 402–03, J. Scanlon.

omitted); *see also Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) ("If the terms of a contract are unambiguous, the obligations it imposes are to be determined without reference to extrinsic evidence, ..., and trade custom and usage is not admissible to contradict or qualify its provisions, ...") (internal citations omitted).

■ Applying these principles of contract interpretation to the evidence in the record, the Court concludes that the 1989 Amendment was in effect during the audit period at issue and, thus, under the CBAs, UPS's contribution obligations were limited to an eight-hours-per-day cap. Once the 1989 Amendment amended the 1987–1990 CBA to provide for an eight-hours-per-day cap, that cap remained in effect until such time as the parties negotiated a different arrangement. Despite the Teamsters' initial proposals to remove the eight-hours-per-day cap in both 1993 and 1997, they withdrew those proposals and the eight-hours-per-day cap remained a part of the CBAs. Moreover, as UPS noted, there would have been no need for the Teamsters to propose an amendment which would have eliminated the eight-hours-per-day cap if such a cap had not existed. Furthermore, the Court cannot, as the Funds would have it do, read the 1990–1993 CBA without reference to the terms of prior CBAs. Nor does Article 42 of the CBAs require the Court to do so. In fact, Article 42 supports the Court's conclusion that those provisions of the CBA that were not revised continued to be part of subsequent CBAs. Finally, Article 42, Section 3's reference to the effective date solely for revisions is another indication that those parts of the CBA which are not changed remain a part of the next CBA.

### b. The impact of the Participation Agreements on UPS's contribution obligations

■ The Funds contend that even if the Court finds that the eight-hours-per-day cap set forth in the 1989 Amendment was intended to continue beyond the expiration date of the 1987–1990 CBA, such a cap is null and void because it is inconsistent with the Participation Agreements, which provide for a weekly cap, but not a daily cap. *See, e.g.,* P–28 (New York State Teamsters Conference Pension and Retirement Fund Participation Agreement ("Participation Agreement")) at ¶ 1(c) ("The employer agrees to contribute to the New York State Teamsters Conference Pension and Retirement Fund, as follows, not to exceed the maximum: Effective 8/1/91, 3.595 per hour, 143.80 weekly").[12] The Participation Agreement also provides that

> [n]o agreement between the employer and the Union shall alter this rule or any other rule or provision of this [Participation Agreement]. That in the event there is any agreement between employer and Union that is contrary to or inconsistent with the terms of this [Participation Agreement] or the rules of the Pension Fund, such inconsistent provisions shall be null and void and superseded by the terms of this [Participation Agreement] and/or the rules of the Fund.

*See* P–28 (Participation Agreement) at ¶ 1(b).

UPS does not dispute that the Participation Agreements provide for a weekly, rather than a daily, cap. Instead, UPS argues that the Participation Agreements are contracts between the Teamsters and UPS, not the Funds and UPS, and that the Participation Agreements are intended to

---

**12.** The weekly amount of $143.80 is equal to the hourly rate of $3.595 times forty hours.

be substantively the same as the CBAs. To support this assertion, UPS notes that the Participation Agreements provide that they "shall continue in full force and effect for the same term as the Labor Agreement. A new [Participation Agreement] must be signed and submitted for each subsequent Collective Bargaining Agreement." *See* P–28 (Participation Agreement) at ¶ 18. UPS also points to the fact that the paragraph directly above the signature line provides that "[w]e hereby certify that the provisions, terms and wording in the Collective Bargaining Agreement are not contrary to or inconsistent with the provisions, terms and wording in this [Participation Agreement]."[13] *See id.* at ¶ 20.

UPS further contends that it is not bound by the Participation Agreements because when signing the Participation Agreement that related to the 1990–1993 CBA it included the phrase "subject to contract," *see* P–28 (Participation Agreement); and it refused to sign the Participation Agreements which relate to the 1993–1997 and 1997–2002 CBAs. At trial, Gerald Nerone, UPS's Regional Labor Relations Manager, testified that he included the phrase "subject to contract" next to his name when he signed the Participation Agreement that covered the period of 1990–1993 because he "wanted to make sure that what [he] was signing pertained to what was in the [CBA]." *See* Trial Tr. at 685, G. Nerone. He also testified that it was not his understanding that he was given "permission" to modify the Participation Agreement, *see id.* at 686, G. Nerone, and that he signed the Participation Agreement "subject to contract" mostly

for money reasons. *See id.* at 696, G. Nerone ("[I]t was mostly the money. The money was incorrect in the top, on the top portion of the [Participation Agreement], and I was concerned that I was signing something that was going to cost more money than what was agreed to."). Nerone also stated that neither the Funds nor the Teamsters returned the Participation Agreement to him to dispute his inclusion of the phrase "subject to contract." *See id.* at 682, G. Nerone.

UPS also contends that because it is not an employer covered by the General Freight Agreement, it was not required to sign the Participation Agreements related to the CBAs covering the same periods.[14] To support this proposition, UPS relies upon the language of the CBA which provides, in pertinent part, that

> [t]he Employer and Union hereby agree simultaneously herewith to execute a stipulation submitted by the Pension Trustees [and Health and Hospital Trustees] setting forth the provisions relating to the Pension Fund [and Hospital Fund] as negotiated for the General Freight Agreement and certifying that the Employer has entered into a written agreement containing such provisions. The Fund Trustees may reserve the right to refuse to accept contributions from the Employers who fail to execute such stipulation.

*See* P–8 (1990–1993 CBA) at Article 61, Section 2; P–9 (1993–1997 CBA) at Article 63, Section 2.

---

**13.** Rather than support UPS's contention that the Participation Agreement must comply with the CBA, this statement demonstrates exactly the opposite. The signatories of the Participation Agreement are certifying that there is nothing in the CBA that is contrary to the terms of the Participation Agreement,

thereby indicating that the Participation Agreement is controlling.

**14.** The Funds and UPS agree that UPS is not a signatory to the National Master Freight Agreement. *See* Joint Pre–Trial Stipulations at "Facts Not in Dispute" at ¶ 12.

UPS's assertion that it is not bound by the Participation Agreements is unavailing and unsupported by case law construing participation agreements similar to the ones at issue in this case. In *Truckmen's & Warehousemen's Ass'n of Rochester v. N.Y. State Conference Pension & Retirement Fund*, 751 F.Supp. 351 (W.D.N.Y.1990), the court concluded that the paragraph in a participation agreement exactly like ¶ 1(b) in this case was neither arbitrary nor capricious. *See id.* at 357. The court explained that as a wholly independent body, " 'the Fund is not bound by agreements entered into by local affiliates of the [union] .... [and][t]herefore, the **trust provisions are to govern when in conflict with contrary provisions in a collective bargaining agreement.' "** *Id.* at 358 (internal quotation and internal citations and other citations omitted) (emphasis added). Here, assuming that the 1989 Amendment, with its eight-hours-per-day cap, became part of subsequent CBAs, those CBAs are inconsistent with the Participation Agreements, which do not have an eight-hours-per-day cap. Therefore, because the Participation Agreements govern, the eight-hours-per-day cap in the CBAs is void and UPS is not entitled to rely upon that cap to limit its contribution obligations.

The fact that UPS signed the 1990–1993 Participation Agreement "subject to contract" does not require a different result. It is well-settled that one party cannot unilaterally modify the terms of a contract. *See Beaver Employment Agency, Inc. v. Noestring, Inc.*, 160 Misc.2d 454, 455, 609 N.Y.S.2d 509 (1993) (citing *Becker v. Faber*, 280 N.Y. 146, 19 N.E.2d 997 (1939), *rehearing denied* 280 N.Y. 730, 21 N.E.2d 216 (1939)). Thus, UPS could not modify

the Participation Agreement by adding the terms "subject to contract" without the consent of the Teamsters. There is no dispute that the Teamsters did not consent to this additional term. Thus, "the original terms of the [Participation Agreement] remain[ed] in effect." *Id.* (citing *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 429 N.Y.S.2d 715 (2d Dept. 1980)).[15]

Finally, the fact that UPS did not sign any subsequent Participation Agreements and that the Funds, nonetheless, accepted UPS's contributions does not mandate a finding that UPS is not bound by the terms of those Participation Agreements. Each of the Participation Agreements clearly states that

[t]his **Participation Agreement ... is the basis for participation in the New York State Teamsters Conference Pension and Retirement Fund.** The employer, the Union and the employees, **as a condition of participation in the Fund,** are bound by all the rules and regulations of the Fund now and/or hereinafter adopted by the Board of Trustees of the Pension Fund.

*See* P–28 (Participation Agreement) at ¶ 1(a) (emphasis added).

There is no question that UPS signed the relevant CBAs with the Teamsters and that UPS participated in the Funds by making contributions to the Funds on behalf of its employees. Nonetheless, UPS argues that it participated in the Funds only to the extent that its participation was consistent with the terms of the CBAs.

The Court finds this argument unpersuasive. The CBAs required UPS to sign Participation Agreements, and, therefore, the Court finds that UPS is governed by

---

**15.** Signing the Participation Agreement "subject to contract," without the Teamsters' consent, is tantamount to not signing the Participation Agreement. As discussed below, whether or not UPS signed the Participation Agreements, it is bound by their terms.

the terms of the Participation Agreements whether or not it signed them. Moreover, although the CBAs provide the Trustees of the Funds with the option "to refuse to accept contributions from the Employers who fail to execute [the Participation Agreement]," *see* P–8 (1990–1993 CBA) at Article 61, Section 2; P–9 (1993–1997 CBA) at Article 63, Section 2, their decision not to exercise that option does not absolve UPS of its obligation to abide by the terms of the Participation Agreements. Accordingly, the Court concludes that under the terms of the relevant Participation Agreements, there was no eight-hours-per-day cap on UPS's contribution obligations during the audit period at issue.[16]

### 2. Alleged delinquent contributions related to entitlement pay

The Funds contend that, pursuant to the terms of the Participation Agreements as well as the CBAs and certain Fund Rules, UPS owes contributions for hours relating to entitlement pay, which includes vacation time, holidays, sick leave and unused sick leave. Specifically, the Funds claim that, pursuant to paragraph 1(c) of the Participation Agreements, UPS is required to make contributions for up to 2,080 hours per year (forty hours per week for fifty-two weeks).[17] *See* Trial Tr. at 575–76, R. Morreale.

UPS does not dispute that under the CBA it is required to contribute to the

Funds for entitlement pay and, in fact, asserts that it does so. However, UPS contends that, by interpreting the Participation Agreements in such a way as to require UPS to make such payments up to a maximum of 2,080 hours, the Funds are in essence requiring UPS to make double contributions in some instances. Specifically, UPS contends that the Funds are seeking additional contributions for sick leave (payments made to covered employees for sick days never used and that are not attributable to any particular day); accrued, but unused, vacation time paid to an employee when he or she terminates employment (which is not attributable to any particular vacation period); holidays and roving holidays where the employee either receives wages for working the holiday or is on vacation and receives vacation pay for the same day; and sick leave (where the employee actually comes to work and is paid regular wages for that day).

The issue for the Court to determine is whether it was reasonable for the Funds' auditors to interpret the relevant documents to require UPS to make contributions for up to 2,080 hours per year for each employee who was eligible for entitlement pay, regardless of when UPS actually paid those employees for these entitlements.

### a. Unused sick leave[18]

■ Pursuant to the CBA, UPS is required to compensate its employees for

---

**16.** The Funds request that the Court order UPS to execute the Participation Agreements and contend that UPS's failure to do so constitutes a breach of the terms of the CBA. UPS has failed to execute the Participation Agreements since 1993. However, as noted, whether or not UPS signed the Participation Agreements, it is bound by their terms. Accordingly, the Court finds it unnecessary to order UPS to sign those Participation Agreements.

**17.** Although paragraph 1(c) does not state that contributions are required for up to 2,080 hours, "it requires the employer to contribute the rate specified per hour up to the weekly cap[.]" *See* Trial Tr. at 118, T. Nanna. For example, paragraph 1(c) of the Participation Agreement signed in 1991 provides a per hour contribution of $3.595 and a weekly contribution of $143.80 ($3.595 × 40 hours). *See* P–28 (Participation Agreement) at ¶ 1(c).

**18.** This contribution relates only to the Pension Fund.

unused sick leave.[19] Full time employees receive "eight (8) hours straight-time pay for each sick day and part-time employees shall receive four (4) hours straight-time pay for each sick day." *See* P–8 (1990–1993 CBA) at Article 68; P–9 (1993–1997 CBA) at Article 70, Section 2; P–10 (1997–2002 CBA) at Article 70, Section 2. The Funds contend that if an employee received the unused sick leave pay in a week in which the employee had already received forty hours of pay, UPS did not make contributions for the additional entitlement pay. UPS acknowledges that it did not make contributions for the unused sick leave pay if it had already made contributions for forty hours during that week. *See* Trial Tr. at 355–56, R. Morreale.

In conducting the audit, after assessing all other contributions, the auditors determined whether UPS had made contributions for 2,080 hours per year for each employee. If the 2,080–hour maximum had not been met, the auditors allocated the unused sick leave contributions to a week in which the employee received less than forty hours of pay. To support this method of allocating UPS's contribution obligations, the Funds' auditors testified that they relied upon paragraph 1(c) of the Participation Agreements, which they interpreted as requiring contributions for up to 2,080 hours per year, *see* Trial Tr. at 118, T. Nanna; as well as a November 3, 1986 memorandum, *see* Trial Tr. at 120, T. Nanna; P–220; and an April 27, 1987 memorandum, *see id.* at 119, T. Nanna; P–222. Additionally, the auditors acknowledged that they relied upon a February 26, 1990 memorandum and the meeting minutes attached to that memorandum (the "Paravati interpretation"); *see* Trial Tr. at 578, R. Morreale; P–34; and a March 18, 1987 memorandum, *see* Trial Tr. at 601, R. Morreale; P–221.

The November 3, 1986 memorandum provides that "[w]henever a participating employer is required to compensate its employees for Unused Sick Leave, the rate of contribution required by the Health and Pension Funds shall be the rate in effect for the contract year that the payment for Unused Sick Leave is earned by the employee[.]" *See* P–220. However, pursuant to the April 27, 1987 memorandum, contributions to the Health Fund for unused sick leave were no longer required. *See* P–222.

The March 18, 1987 memorandum provides that "the Fund will not require contributions from Participating Employers that exceed the maximum of forty (40) hours in a week and not to exceed the maximum of fifty-two (52) weeks in a calendar year." *See* P–221. Fund Auditor Russell Morreale testified that this provision is relevant and impacted the audit because the two caps set forth in this provision, "make one cap of 2,080 hours." *See* Trial Tr. at 602, R. Morreale.

As noted, the auditors also relied upon a February 26, 1990 memorandum and the

---

**19.** Article 68 of the 1990–1993 CBA, as well as Article 70 of the 1993–1997 and the 1997–2002 CBAs, provides, in pertinent part, as follows

Unused Sick Leave—Any unused sick leave shall be paid to the employee the first payroll period following Christmas, or such other time as the employee may request. Employees who do not wish to be paid their unused sick leave the first payroll period following Christmas, and who wish to carry their unused sick leave over to the following April, must notify the Company the first week in December of that intention.

Then, if the sick leave is not used by the last payroll period in April, said unused sick leave shall be paid to the employee the first payroll period in May.

*See* P–8 (1990–1993 CBA) at Article 68; P–9 (1993–1997 CBA) at Article 70; P–10 (1997–2002 CBA) at Article 70.

meeting minutes attached to that memorandum. *See* P–34. The meeting minutes are from a Pension Fund meeting, and the parties refer to these minutes as the "Paravati interpretation." According to Morreale, the Paravati interpretation supports the Funds' application of a 2,080–hour–per–year cap. *See* Trial Tr. at 582–83, R. Morreale. However, neither the memorandum nor the meeting minutes specifically make reference to a 2,080–hours–per–year cap.[20] *See* P–34.

Morreale also testified that the language of the minutes "was confusing as it was written, and [that the auditors] felt that [they] needed to clarify it with Mr. Paravati as far as how it would apply to non-Master Freight companies[.]" *See* Trial Tr. at 589, R. Morreale. Thus, the auditors "had a discussion with Mr. Paravati, and he conveyed to [them], ..., that the maximum that a non-freight company would be required to contribute would be [2,080] hours." *See id.* at 589–90, R. Morreale; *see also* Trial Tr. at 134, T. Nanna (Paravati told the auditors that they "could not bind employers who were non-Master Freight to contribute more than 2,080 hours in a year."). Morreale testified that he relied upon Paravati's interpretation of the document in conducting the audit. *See* Trial Tr. at 590.

Looking at the record as a whole, the Court concludes that the auditors' conclusion that UPS is required to make contributions for up to 2,080 hours per year for each bargaining unit employee, regardless of when UPS actually pays an employee for unused sick leave, is reasonable. Moreover, if the Court were to adopt UPS's interpretation, UPS could avoid its obligation to make contributions for unused sick leave by paying its employees for

their unused sick leave in weeks in which those employees had worked forty hours. Such an interpretation would be unreasonable because it would permit UPS, in effect, to avoid its unambiguous obligations under the terms of the CBAs. In addition, such an interpretation—if acted upon—would have grave consequences for the fiscal integrity of the Funds.

### b. Holidays and roving holidays

 In assessing contributions for holiday pay, the auditors relied upon paragraph 10 of the Participation Agreements, which provides that "[p]ayments to the Fund must be paid by the employer for the employees' paid vacations and holiday periods." *See* P–28 (Participation Agreement) at ¶ 10; Trial Tr. at 109, T. Nanna. The auditors also relied upon some of the same documents upon which they relied when assessing contributions for unused sick leave, which the Funds contend established a 2,080–hours–per–year cap. *See* P–34; P–220; P–221; P–222.

The Funds' auditors assessed contributions for holidays and roving holidays under two different sets of circumstances: when UPS provided the employee with holiday pay prior to or after the actual holiday, *see* Trial Tr. at 542–43, R. Morreale, and when UPS only contributed for a forty-hour vacation period when an employee took vacation during a holiday week. *See id.* at 553–54, R. Morreale.

As noted, the Funds contend that the auditors "found situations where a full-time employee, ... would receive 40 hours of work, 40 hour[s][of] vacation and again, UPS omitted to remit the contribution in that period when the employee took the time off for vacation." *See id.* at 537–38,

---

**20.** For example, the minutes provide, in part, that "[t]he trustees agreed the daily or weekly maximum in the cases outlined by Attorney Paravati, Sr. would be the maximum amount the employer is obligated to pay." *See* P–34.

R. Morreale. In support of their assertion that UPS engaged in a practice of providing entitlement pay (for holidays, vacation, sick leave) prior to or after the actual period when the time was taken, the Funds submitted the payroll record of Mr. Donald Clark for the year 1994. *See* P–147. This is one of the records for which the Funds' auditors made an assessment. *See* Trial Tr. at 539, R. Morreale. According to this payroll record, during the week ending June 25, 1994, Clark "was paid 34.94 hours of straight time and some overtime hours, but he was also paid 20 hours of vacation hours, vacation time, and the preceding week, [which was the] week ending 6/18, he has no pay[.]" *See id.* Morreale testified that since no contributions were submitted for the week of June 18, 1994, in his opinion, this represents a scenario in which the vacation period was omitted. *See id.*

At trial, the Funds also introduced a demonstrative aid, *see* P–183, which was intended to illustrate a way in which an employer could avoid making significant amounts of contributions for entitlement pay. Morreale testified that the aid demonstrated a way

[f]or an employer to avoid contributions for holidays, sick time, vacation time, by allowing the employer to pay their employee [in] the first paycheck of the year

all of his vacation pay, all of his sick time and all of his holidays, and if you stick strictly to the rule that contributions are only required up to 40 hours in a week, in those subsequent periods, when the [employee] took a vacation period, or when there was a holiday or [the employee] took a sick day, then the employer would not be required to contribute for that time [ ] which is actually the time off for vacation or for sick time.

*See* Trial Tr. at 542, R. Morreale.

Although the Funds admit that the demonstrative aid shows the "worst case scenario," Morreale testified that with respect to sick pay, vacation pay and holiday pay, UPS's practices mirrored this scenario to a lesser extent. *See id.* at 542–43, R. Morreale.

UPS contends that the Funds are seeking contributions for holidays (and also vacations) because they used an auditing technique known as " 'filling the holes,' *i.e.* going beyond the weekly contribution maximum and assessing contributions for holiday- or roving holiday-related pay." [21] *See* UPS's Post–Trial Brief at 29 at ¶ 81. UPS asserts that this technique is improper because it forces UPS to make contributions beyond the forty-hours-per-week cap.[22]

Second, as noted, during the audit, the auditors found that if a holiday occurred

---

**21.** At trial, Nanna was asked whether the auditors assessed contributions for more than forty hours per week. Nanna provided the following response: "I never assessed in excess of a 40–hour week. I discussed that contribution delinquencies were applied to the period in which the employee took his holiday or his vacation and in that week, obviously that there were no obligations remitted and we assessed for the vacation which was allocated and applicable to that specific week." *See* Trial Tr. at 134, T. Nanna; *see also* Trial Tr. at 135, T. Nanna ("My testimony is [that] on vacation and holidays, that assessments were made during the period where the employee's vacation and holiday

periods were taken or required to be taken."). However, the auditors still abided by what they believed to be a 2,080–hours–per–year cap. *See* Trial Tr. at 137–38, T. Nanna.

**22.** According to Scanlon, the way that UPS contributed for holidays is that "if during the week there was a holiday, and an employee was paid, [UPS] made contributions for the max, 40 hours[.]" *See* Trial Tr. at 359, J. Scanlon. However, "if ... an employee [came] in on a holiday, ..., [UPS] would not make an additional day's contribution, because [UPS] already hit the max at 40 hours." *See id.*

during the same week in which an employee was on vacation, UPS did not pay contributions for the holiday. According to Morreale, even though the employee would receive pay for forty-eight hours, UPS would only make contributions for forty hours. *See* Trial Tr. at 553, R. Morreale. UPS does not dispute that it failed to make contributions under these circumstances but rather contends that it was not required to make such "double" contributions. *See* UPS's Post–Trial Brief at 5 at ¶ 9 (UPS contends that, with respect to holidays and roving holidays, it "contributes to the Funds for holidays and roving holidays **taken** by its covered employees, but does not 'double contribute' for a day when the employee is out on vacation during a week in which a holiday falls or when the employee works on the holiday.").

Based upon all the evidence, the Court concludes that with respect to contributions that UPS was required to make for holidays and roving holidays, the Funds' use of a 2,080–hours–per–year cap is reasonable. In addition, the Court finds that by relying upon the 2,080–hours–per–year cap and allocating UPS's contribution obligations to weeks in which UPS had not made contributions in excess of the forty-hours-per-week cap, the Funds complied with the terms of both the CBAs and the Participation Agreements and did not require UPS to do anything other than to meet its obligations under those agreements.

■■■ A related issue involves UPS's obligation to make contributions for vacation pay, holiday pay and sick pay of its part-time employees. According to Morreale, "concerning a part-time employee who would receive 20 hours of work time and 20 hours of vacation and/or entitlement pay, UPS normally would only contribute on the 20 hours of work time and ignore the contribution for the vacation and/or

entitlement pay." *See* Trial Tr. at 537, R. Morreale.

At trial, UPS's former District Labor Relations Manager for the Upstate New York District, John Scanlon, was asked how UPS contributes for part-time employees' vacations. *See id.* at 395, J. Scanlon. Scanlon testified that if a part-time employee works twenty hours in one week and then takes twenty hours of vacation, UPS makes contributions for forty hours. *See id.* at 396, J. Scanlon. Scanlon also stated that "40–hour max" applies to both part-time and full-time employees. *See id.* at 397, J. Scanlon. Although Scanlon's testimony specifically related to vacation pay, his acknowledgment that UPS is required to pay for up to forty-hours for part-time employees also applies to holidays and sick leave since the contributions for those categories are similar to contributions for vacations. In addition, Scanlon's testimony is consistent with Morreale's in the sense that Scanlon indicated that UPS has already made contributions for these part-time employees while Morreale stated that, during the course of the audit, it was learned that UPS did not make such contributions. When asked specifically whether Scanlon's testimony with regard to the method for contributing for vacations and entitlement pay was inconsistent with the audit results, Morreale answered, "Yes, it was." *See id.* at 537, R. Morreale. Based upon the testimony at trial, the Court concludes that UPS is required to make contributions for part-time employees for up to forty hours per week.

### c. Vacation time

■■■ In assessing contributions for vacation time, the auditors once again relied upon paragraph 10 of the Participation Agreements, which provides that "[p]ayments to the Fund must be paid by the employer for the employees' paid vacations

and holiday periods." *See* P–28 (Participation Agreement) at ¶ 10; Trial Tr. at 109, T. Nanna. The auditors also relied upon primarily the same Fund Rules that they used when assessing contributions for unused sick pay and holiday pay, including the Paravati interpretation, *see* Trial Tr. at 133, T. Nanna; P–34; a November 3, 1986 memorandum, *see* Trial Tr. at 579, R. Morreale; P–220; an April 27, 1987 memorandum, *see* Trial Tr. at 579, R. Morreale; P–221; and a March 18, 1987 memorandum, *see* Trial Tr. at 579, R. Morreale; P–222.

The Funds' rationale for assessing contributions for vacation time is similar to their rationale for assessing contributions for holiday pay. In particular, the Funds contend that UPS avoided making payments for contributions by providing its employees with vacation pay prior to or after the actual vacation period. *See* Trial Tr. at 539, R. Morreale. Again, in support of this assertion, the Funds point to the payroll records of Mr. Donald Clark, *see* Trial Tr. at 539, R. Morreale; P–147, as well as the demonstrative aid, *see* Trial Tr. at 542–43, R. Morreale; P–183. The Funds contend that when determining contributions, the Funds are required to look at the actual holiday or vacation period as opposed to the date when the money is actually paid to the employee.[23] *See* Trial Tr. at 131, T. Nanna.

According to the Funds' auditors, when assessing contributions for vacation pay, they would assess such contributions by allocating the vacation contributions to a week in which no contributions were made. *See* Funds' Pre–Trial Brief at 19. Again, UPS contends that the auditing technique the auditors used was improper.

The Court concludes that the Funds' auditors' practice of looking at an employee's actual holiday or vacation period, rather than the date on which UPS actually paid the employee for this time, was reasonable. In addition, the Court finds that Funds' auditors' reliance upon the 2,080–hours–per–year cap as a basis for allocating these contributions was also reasonable. As noted above, by relying upon both the forty-hours-per-week and 2,080–hours–per–year caps, the Funds complied with both the relevant CBAs and the Participation Agreements and required UPS to contribute only that which it was required to contribute under those agreements.

### d. Sick leave

In assessing the contributions for sick leave, the Funds' auditors relied upon Article 68 of the CBA, which provides, in pertinent part, that

> [e]mployees shall have the option after vacations are bid and weeks are available during the non-peak time to use these sick days for vacation, five (5) days at a time only. Any employees who select this option may elect to use roving holidays for future sick days.

*See* P–8 (1990–1993 CBA) at Article 68; Trial Tr. at 107, T. Nanna.

---

**23.** An issue related to vacation pay is the fact that, in some situations, an employee may receive compensation for vacation time and then also work during the vacation period. *See* Trial Tr. at 275, J. Pridell. Pursuant to the CBA, an employee should not work his vacation and be paid for his vacation at the same time. *See* P–8 (1990–1993 CBA) at Article 58, Section 2 ("Vacation pay shall not be paid in lieu of vacation period."). Thus, UPS contends that it does not make contributions for this period because it would be a "double" contribution. UPS points to the fact that the Teamsters are aware that it occasionally happens that an employee works during his or her vacation. *See* Trial Tr. at 358, J. Scanlon. However, the Teamsters have never pursued a grievance arbitration to stop the practice. *See id.* at 359, J. Scanlon.

The dispute surrounding UPS's contribution obligations for sick leave is similar to that regarding its contribution obligations for vacation pay. The Funds contend that, when an employee is paid for sick leave, UPS is required to make contributions. *See* Trial Tr. at 95–96, T. Nanna. Based upon Article 68 of the 1990–1993 CBA, in certain situations, sick days are treated like vacation days and, thus, the Funds contend that contributions are to be made for this time. *See id.* at 107. Again, central to this issue is the Funds' assertion that UPS avoided making contributions for sick leave by providing its employees with sick-leave pay prior to or after the actual sick-leave period.

UPS again contends that the Funds used an improper audit technique. UPS also asserts that the Funds are attempting to require UPS to make "double contributions" and are thereby adjusting the amount of its contributions and that such an adjustment is not permissible. The Court finds these arguments unpersuasive.

For the same reasons as those stated above, the Court finds that the auditors' use of the 2,080–hours–per–year cap, together with the forty-hours-per-week cap, for determining UPS's contribution obligations for sick leave was reasonable.[24]

### 3. Workers Compensation and Disability

■ The Funds seek contributions for workers compensation and disability absences. UPS contends that it was improperly assessed for contributions for employees out of work on workers compensation

---

**24.** Finally, UPS asserts that even if the Pension Fund is able to demonstrate that its rules for determining UPS's contribution obligations are reasonable, such a showing by the Health Fund is irrelevant. Citing 29 U.S.C. §§ 1081 and 1082, UPS asserts that, as an employee welfare benefit plan, the Health Fund is not subject to ERISA's funding requirements. *See* UPS's Post–Trial Brief at 59 at ¶ 42. Pursuant to § 1081, "an employee welfare benefit plan[ ]" is exempted from the funding requirements outlined in that part of the statute. *See* 29 U.S.C. § 1081(a)(1).

Additionally, UPS points to the fact that within the Pension and Retirement Fund Agreement and Declaration of Trust, paragraph 11(g) provides that
The Trustees shall establish a funding policy and method consistent with the objectives of the Plan and the requirements of Part 3 Title 1 of ERISA. The Trustees shall meet annually at a stated time of the year to review the funding policy and method and the results shall be recorded in the minutes of the Trustees meeting.
*See* P–1 (Agreement and Declaration of Trust) at ¶ 11(g).
The Health and Hospital Fund Trust Agreement does not contain a similar provision. *See* P–2 (Trust Agreement for Health and Hospital Fund).
UPS does not cite any case authority to support its assertion that the Health Fund

should be treated differently than the Pension Fund. The Funds brought this suit pursuant to 29 U.S.C. § 1145, which constitutes part 5, the "Administration and Enforcement" section of ERISA. As noted, §§ 1081 and 1082 relate to the "Funding" section of ERISA. Welfare benefit plans are not specifically exempted within the Administration and Enforcement section of ERISA. Moreover, Health Funds have commenced several cases seeking delinquent contributions pursuant to § 1145. *See, e.g., N.Y. State Teamsters Council Health & Hosp. Fund v. Perfection Oil Co., Inc.,* No. 95–CV–125, 1998 WL 315096, *1 (N.D.N.Y. June 11, 1998) (New York State Teamsters Council Health and Hospital Fund commenced an action against defendant employer pursuant to 29 U.S.C. §§ 1132, 1145, seeking delinquent contributions); *N.Y. State Teamsters Council Health & Hosp. Fund v. A.T. & A. Trucking Corp.,* No. 93–CV–1280, 1997 WL 216232, *1 (N.D.N.Y. Apr. 11, 1997) (The plaintiff Health and Hospital Fund sought to recover delinquent contributions for defendant employer pursuant to 29 U.S.C. § 1145).

Based upon the relevant case law and UPS's failure to cite any case authority to the contrary, the Court finds that UPS's argument with regard to this issue is unavailing.

and disability leave. UPS also asserts that contributions were improperly assessed for causal employees and that the techniques that the auditors used when considering these two categories were improper.

In assessing a delinquency against UPS for employees on disability, the Funds' auditors relied upon paragraph 14 of the Participation Agreements and a "Rules of the Fund" memorandum dated April 19, 1982.[25] *See* Trial Tr. at 95, 145, T. Nanna; P–22 (Participation Agreement) at ¶ 14; P–32 (Memo regarding "Rules of the Fund," dated April 19, 1982). Fund Auditor Thomas Nanna testified that the auditors followed New York State disability law and made assessments based upon records that UPS provided and on which UPS indicated whether an employee was on disability.[26] *See* Trial Tr. at 147, T. Nanna. Also, Fund Auditor Russell Morreale testi-

fied that if UPS's records indicated that an employee was "casual" or an "extra" employee, the auditors did not assess contributions for workers compensation and disability. *See id.* at 540, R. Morreale.

With respect to contributions for employees on disability, UPS contends that contributions should have been assessed only for "regular" employees and not "casual" employees or others. UPS also points to the fact that the Funds' auditors relied upon UPS's payroll records to determine whether an employee was on disability. However, UPS contends that these payroll records did not indicate whether the employee's required notification of the disability was proper.[27] Moreover, UPS contends that the Funds did not apply the terms of the 1993 Settlement Agreement when making calculations for disability.[28]

**25.** Paragraph 14 of the Participation Agreements provides that

When the labor agreement supplies benefits for illness or off-the-job injury, the following shall apply: If a regular employee is absent because of illness or off-the-job injury and notifies the employer of such absence, the employer shall continue to make the required contributions for a period of four (4) weeks. If a regular employee is injured on the job, the employer shall continue to pay the required contributions until such employee returns to work: however, such contributions shall not be paid for a period of more than 52 weeks.

*See* P–22 (Participation Agreement) at ¶ 14.

The "Rules of the Fund" memorandum addresses an employee's obligation to notify the employer if he or she is injured or ill. *See* P–32; Trial Tr. at 145–46, T. Nanna.

**26.** According to Nanna, "[t]he payroll records that [the auditors] reviewed, . . ., [either] specified a disability for a particular week or there was a code in the payroll that specified that the employee was on disability. [The auditors] relied on that information to conduct the audit." *See* Trial Tr. at 148, T. Nanna.

**27.** At trial, Funds auditor Thomas Nanna was asked whether the auditors examined any

documents to determine whether employees had provided proper notice of their absence of disability. Nanna provided the following response

We relied upon the information supplied by [UPS]. The records that we reviewed indicated employees were on disability. In order for UPS to label or categorize somebody as being on disability, they would have had to have been notified. How would they know if somebody was on disability unless they were notified by an individual. . . . We relied upon that information in conducting the audit.

*See* Trial Tr. at 147, T. Nanna.

**28.** UPS appears to be referring to the following provisions of the 1993 Settlement Agreement

5. It is understood that [UPS] was not, and is not, required to contribute to the Pension [and Health] Fund[s] during the 1989–1990 and **subsequent audit periods** for employees who are absent, without pay, on non-work related illnesses of less than eight days (hereinafter "unpaid sick"); and that no penalties or fees will be assessed against [UPS] for not contributing for the unpaid sick category on or after October, 1990.

Thus, the Funds "did not make any adjustment, or credit any amounts relating to contributions for disabilities lasting fewer than eight days." *See* UPS's Post–Trial Brief at 34 at ¶ 93 (citations omitted).[29]

Based upon the trial testimony, it is clear that the auditors relied upon UPS's records when assessing contributions for workers compensation and disability. The Court finds that it was logical for the auditors to do so because UPS, as the employer, was responsible for maintaining those records and was in the best position to ensure their accuracy.

With respect to UPS's assertion that the Funds failed to consider the terms of the 1993 Settlement Agreement (which covered the 1987–1988 and 1989–1990 audit periods), even assuming that the 1993 Settlement Agreement applied to the audit period at issue, Funds Auditor Russell Morreale testified that "the records that UPS had provided to [the auditors] did not allow [them] to determine whether [UPS]

made contributions on any illnesses of less than eight days." *See* Trial Tr. at 551, R. Morreale. Since UPS had an obligation to maintain accurate records and to provide the Funds with information that related to the circumstances of its employees on disability and workers compensation leave, any error that the Funds may have made in calculating UPS's contribution obligations, which were due to UPS's failures, must be borne by UPS. Accordingly, the Court concludes that, based upon the evidence that the auditors had before them, they correctly assessed UPS for workers compensation and disability contributions.

### 4. Orientation time

■ The parties dispute whether UPS was required to make contributions to the Funds for the three or four day period that UPS's employees spend in orientation sessions, which they are required to attend at the beginning of their employment. To

---

6. It is also understood that [UPS] is required to contribute to the Pension [and Health] Fund[s] for employees who are absent, without pay, on non-work related injuries of less than eight days but only if, and after, the Health Fund has paid a claim on behalf of an employee regarding such an injury and has notified [UPS] in writing that it has paid such a claim. . . .

*See* D–3 (1993 Settlement Agreement) at ¶¶ 5–6; D–4 (1993 Settlement Agreement) at ¶¶ 5–6 (emphasis added).

It should be noted that UPS does not specifically contend that the Health Fund failed to provide notice of the claims.

UPS also points to the fact that Nanna testified that the auditors were instructed not to apply the 1993 Settlement Agreement when conducting the audit. *See* Trial Tr. at 130, 138–39, T. Nanna. However, even though Nanna testified that the auditors did not apply the 1993 Settlement Agreement, based upon the record before the Court, it is clear that the Funds' auditors followed a notice requirement and did not knowingly assess UPS for employees who were absent due to injury or

illness for less than eight days. *See id.* at 148, T. Nanna (testifying that if there is proper notice, "the contribution obligation is from the first day that the employee becomes disabled."); *see also id.* at 551–52, T. Morreale (asserting that the counterclaim based upon the notice issue as it relates to disability contributions was excessive because of the number of employees for whom UPS contends that it made overpayments. Morreale did not claim that the notice requirement did not apply or that UPS was always obligated to make contributions even if the employee was absent for less than eight days.); Funds' Pre–Trial Brief at 21.

29. As discussed below, UPS's counterclaim is based, in part, upon its theory that it overpaid contributions for employees on disability. When asked about the alleged overpayments during trial, former UPS District Labor Relations Manager for the Upstate New York District, John Scanlon, acknowledged that the alleged overpayments were occurring because of UPS's "new payroll system" and also as a result of "errors." *See* Trial Tr. at 385, J. Scanlon.

support their assertion that contributions are required for employees during this orientation period, the Funds point to the fact that paragraph 1(b) of the Participation Agreements requires UPS to contribute for "all employees doing bargaining unit work."[30] *See* P–22 (Participation Agreement) at ¶ 1(b). Moreover, paragraph 1(c) of the Participation Agreements requires that "contributions begin on all employees from the first hour of the first day of employment." *See* P–22 (Participation Agreement) at ¶ 1(c); Trial Tr. at 554–55, R. Morreale. Neither the Participation Agreements nor the CBAs define "bargaining unit work."

UPS contends that the Funds' auditors improperly assessed delinquencies related to employees who were attending mandated orientation sessions. During the orientation period, employees "learn the general practices, rules, safety, payroll, [and] the different aspects of the company, including the company history, and the job they're about to do...." *See* Trial Tr. at 380, J. Scanlon. According to UPS, although it pays its employees for the time they spend in orientation sessions, *see* Trial Tr. at 394, J. Scanlon, the employees are not performing "bargaining unit work" during that time and, thus, according to UPS, it is not required to make contributions to the Funds for that time. *See* Trial Tr. at 393, J. Scanlon; Trial Tr. at 482, E. Kozlowski.

The Court finds that UPS's interpretation of "bargaining unit work" as limited to "handling packages" is too narrow. When read together, paragraphs 1(b) and 1(c) of the Participation Agreements indicate that contributions should begin on the first day of employment, regardless of the type of work the employees are performing; i.e., attending orientation sessions or handling packages. Moreover, the Court finds that the time spent learning the responsibilities and techniques of their jobs as well as the history and operations of UPS is undoubtedly directly related to job performance and, thus, constitutes "bargaining unit work." Accordingly, the Court concludes that UPS must contribute to the Funds from the first hour that employees begin working at UPS, including the hours they spend attending orientation sessions.

### 5. *Jury Duty, Funeral Leave and Military Leave*

██ The Funds also seek contributions for jury duty, funeral leave, and military leave. There was very little testimony relating to these categories adduced at trial. Moreover, in their Pre–Trial Stipulations, the parties do not list these three categories as constituting "facts in dispute." Nonetheless, in their Post–Trial Reply Brief, the Funds state that contrary to UPS's claim that contributions are only being sought for "certain audit categories,"

---

**30.** Paragraph 1(b) provides, in pertinent part, that

> The undersigned, employer and Union, understand and agree that Health and Hospital [and Pension] contributions shall be made as set forth herein, on all employees doing bargaining unit work, and on any and all other employees doing the same work as bargaining unit employees, whether or not they are included in the bargaining unit, whether or not they are union members, whether full time, part time, casual, or seasonal.

*See* P–22 (Participation Agreement) at ¶ 1(b).

The Funds correctly point out that it has previously been held that in creating the terms of paragraph 1(b), the Funds did not act arbitrarily and capriciously. *See Truckmen's & Warehousemen's Ass'n of Rochester v. N.Y. State Conference & Retirement Pension Fund,* 763 F.Supp. 717, 721 (W.D.N.Y.1991); *Truckmen's & Warehousemen's Ass'n of Rochester v. N.Y. State Conference Pension & Retirement Fund,* 751 F.Supp. 351, 355–56 (W.D.N.Y.1990). However, these cases did not specifically address the "bargaining unit work" portion of paragraph 1(b).

the Funds seek to recover all delinquencies identified in the audit. *See* Funds' Post–Trial Reply Brief at 9. Based upon the relevant documents, the Court concludes that UPS is required to make contributions to the Funds for jury duty, funeral leave and military leave on behalf of its bargaining unit employees.

### 6. UPS's counterclaim

UPS asserts a counterclaim seeking a credit or reimbursement for the following items (1) contributions made on behalf of employees absent, without pay, due to a non-work related illness lasting less than eight days; (2) contributions made for holidays paid during a vacation week; (3) contributions made for employees in orientation; and (4) contributions made in excess of the three-hour maximum applicable to part-time employees out on workers compensation or disability.

The Funds contend that the evidence presented at trial demonstrates that UPS has an "utter lack of support" for its counterclaim and that such claim "was nothing more than an attempt by UPS to gain a bargaining advantage in settlement discussions with the Funds regarding the 1989–1994 audit."[31] *See* Funds' Post–Trial Brief at 15. The Funds also point to the fact that the only document UPS provided to show a basis for its counterclaim was created by UPS's current counsel, Glenn Butash. *See* Trial Tr. at 469, E. Kozlowski; P–89; P–90. In addition, the Funds note that during trial the amount of credit UPS sought decreased by approximately $1 million. *See* P–89; P–90; Trial Tr. at 478, E. Kozlowski (alleged Pension Fund overpayment for contributions made on be-

half of absent employees, without pay, due to a non-work related illness lasting fewer than eight days decreased from $925,554.97 to $694,166.22); Trial Tr. at 511–12, E. Kozlowski (alleged Pension Fund overpayment for orientation decreased from $298,999 to approximately $125,000); Trial Tr. at 517, E. Kozlowski (alleged Health Fund overpayment for orientation decreased from $363,917 to $69,103).

Finally, the Funds point to the fact that UPS used estimates and amounts from an already settled audit period to determine the amount of its alleged overpayment to the Funds. *See* Trial Tr. at 473–80, E. Kozlowski (testifying that it was his understanding that, when alleging that it had made overpayments to the Funds and drafting a document containing those alleged overpayments, UPS drew its figures from the 1993 Settlement Agreement, which covered the period of January 1, 1987 through December 31, 1988). Moreover, UPS conducted a mere two-day audit and used samples of data from time periods outside of the audit to arrive at the figures in its counterclaim. *See id.* at 488–93, E. Kozlowski (testifying that in determining the alleged overpayment for orientation, UPS based its analysis on new hires for 1996 as opposed to actually considering the number of new hires for the time period at issue.). Based upon these factors, the Funds contend that UPS's counterclaim consists of only a "compilation of unsubstantiated allegations."

To the extent that the Court has determined that UPS is liable for certain categories of contributions, its counterclaim is

---

**31.** The Funds also contend that it is "simply implausible" that UPS believed that it had overpaid the Funds since it never made a written demand for alleged overpayment. *See* Funds' Post–Trial Brief at 16. UPS had pre-

viously sent such an overpayment letter to the Funds for overpayments that occurred from January 1, 1987 through December 31, 1988. *See* P–121 (Letter dated January 25, 1990).

no longer viable.[32] Furthermore, with respect to the disability pay issue, the Court finds that UPS has failed to provide adequate support for that part of its counterclaim. At trial, Fund Auditor Russell Morreale was asked about UPS's counterclaim with respect to the issue of illnesses lasting less than eight days and the notice requirement. In response to a question from the Funds' counsel as to whether Morreale "perform[ed] a calculation to determine how many absences for illnesses of less than eight days would have had to have occurred for UPS to arrive at the overpayment figure of $694,166.22[,]" Morreale answered

> Yes, I did. Approximately 2,000 cases per year would have had to have occurred or illnesses of less than eight days, and in every one of those cases UPS would have had to have [made an] overpa[yment] [ ]. In the years '97 through '99 we did a quick average and UPS paid on approximately 367 disability cases per year, so that the 2,000 cases every single year just didn't—didn't show—didn't appear at all.

*See* Trial Tr. at 551–52, R. Morreale.

■ Likewise, the Court finds that UPS failed to establish that it is entitled to any reimbursement for contributions which it contends were made in excess of the three-hour maximum applicable to part-time employees out on workers compensation or disability. Accordingly, the Court dismisses UPS's counterclaim in its entirety.

## III. CONCLUSION

After carefully considering the record in this matter, including the evidence adduced at trial and the parties' pre- and post-trial briefs, the Court hereby

**ORDERS** that the Participation Agreements govern UPS's contribution obligations and because the Participation Agreements do not include an eight-hours-per-day cap, but rather only a weekly cap, the eight-hours-per-day cap in the CBAs is not to be applied when calculating UPS's contribution obligations for the audit period at issue; and the Court further

**ORDERS** that in calculating UPS's contribution obligations for entitlement pay for the audit period at issue the Funds must comply with the forty-hours-per-week and 2,080–hours–per–year caps; and the Court further

**ORDERS** that UPS is liable to the Funds for workers compensation and disability contributions as assessed by the Funds; and the Court further

**ORDERS** that UPS must contribute to the Funds from the first hour that employees begin working at UPS, including the hours the employees spend attending orientation sessions; and the Court further

**ORDERS** that UPS must contribute to the Funds for jury duty, funeral leave and military leave; and the Court further

**ORDERS** that UPS's counterclaim is dismissed in its entirety; and the Court further

**ORDERS** that a conference is scheduled for **May 16, 2002, at 4:00 p.m.,** in **Syracuse, New York,** for the purpose of establishing the procedure to be followed to ascertain the amounts that UPS owes to the Funds consistent with this Memorandum–Decision and Order.

**IT IS SO ORDERED.**

---

**32.** For example, UPS seeks reimbursement for contributions it made for hours its employees spent at orientation sessions. Since the Court has concluded that UPS is required to make contributions for that time, this portion of its counterclaim no longer viable.