NEW YORK STATE TEAMSTERS CONFERENCE PENSION & RETIREMENT FUND, New York State Teamsters Council Health & Hospital Fund, J. Dawson Cunningham, Frank Posato, Thomas Goodwin, Brian Masterson, John Bulgaro, Anthony Simoes, Daniel Schmidt and Don Little, Plaintiffs–Appellees,

v.

UNITED PARCEL SERVICE, INC., Defendant–Appellant.

No. 03–7349, 04–1366.

United States Court of Appeals, Second Circuit.

Argued: May 3, 2004.

Decided: Aug. 30, 2004.

Howard Shapiro, Shook, Hardy & Bacon, New Orleans, LA (Edward P. Lynch and Glenn E. Butash, Pitney, Hardin, Kipp & Szuch LLP, Morristown, NJ, on

the brief) for Defendant–Appellant United Parcel Service, Inc.

Brian T. Ortelere, Morgan, Lewis & Bockius, LLP, Philadelphia, PA (Michael J. Sciotti, Hancock, Estabrook, Syracuse, NY, on the brief) for Plaintiffs–Appellees New York State Teamsters Conference Pension and Retirement Fund, New York State Teamsters Council Health and Hospital Fund, J. Dawson Cunningham, Frank Posato, Thomas Goodwin, Brian Masterson, John Bulgaro, Anthony Simoes, Daniel Schmidt and Don Little.

Before: CARDAMONE, JACOBS, Circuit Judges, and KORMAN, District Judge.*

JACOBS, Circuit Judge.

At issue is whether Section 515 ("Section 515") of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, requires Defendant–Appellant United Parcel Service, Inc. ("UPS") to make certain disputed contributions to the New York State Teamsters Conference Pension and Retirement Fund (the "Pension Fund") and the New York State Teamsters Council Health and Hospital Fund (the "Health Fund," together the "Funds"). Section 515 mandates that an employer make contributions to its multiemployer benefit plans in accordance with the terms of the plans or the terms of any relevant collective bargaining agreements. UPS contends that its collective bargaining agreement ("CBA") with the International Brotherhood of Teamsters ("the Teamsters") limits contributions in respect of overtime pay; the Funds contend that UPS is bound by the Funds' Participation

Agreements, which contain no such limitation.

This consolidated appeal[1] is taken from a judgment entered March 26, 2003 after a five-day bench trial in the United States District Court for the Northern District of New York (Scullin, *C.J.*). The district court ruled (i) that Section 515 required UPS to make contributions on the basis of the Participation Agreements irrespective of the terms of its CBA with the Teamsters, (ii) that the Funds' rules and regulations and their auditors' interpretation of those rules and regulations were valid as a matter of law, and (iii) that UPS's counterclaim against the Funds for reimbursement for a variety of past contributions was invalid. UPS challenges all of these rulings on appeal, and adds a fourth claim—that the district court erred in excluding the testimony of a witness who attempted to rebut the estimates of the Funds' auditors.

 Our precedent holds that the rulemaking authority of a multiemployer benefit plan is limited by the terms of its creation documents. Since the Funds' creation documents require the Funds to act in a manner consistent with the plain text of the CBAs entered into by participating employers, we agree with UPS that the Funds cannot enforce rules and regulations that contradict *written* provisions of the CBA executed by UPS and the Teamsters. However, based on the findings of the district court, we conclude that no written term of the CBA contradicted the Participation Agreements on the contributions issue in dispute between the parties at the relevant times in this appeal. Further, we hold (consistent with other Cir-

---

* The Honorable Edward R. Korman, Chief Judge, United States District Court for the Eastern District of New York, sitting by designation.

1. On April 20, 2004, this Court granted a motion to consolidate the main appeal (docketed as 03–7349) with a related appeal (docketed as 04–1366) of the district court's subsequent award of attorneys fees to the Funds.

cuits) that under Section 515 any *unwritten* understanding that allegedly limits an employer's contributions to a multiemployer benefit plan cannot supersede otherwise valid rules and regulations promulgated by the plan. We therefore affirm the district court's ruling that UPS was bound to make contributions in accordance with the rules and regulations of the Funds as memorialized in the Funds' Participation Agreements regardless of a contrary unwritten understanding between UPS and the Teamsters.

We also conclude that the Funds' auditors' estimates of the contributions owed to the Funds by UPS were reasonable, and that UPS's counterclaim for reimbursement is consequently meritless.

### Background

Approximately 5,000 of UPS's employees at its New York distribution hubs in Syracuse and Buffalo are members of local chapters of the Teamsters. The Funds were created by the Teamsters using New York trust agreements executed by the Teamsters and the New York companies that employ members of the Teamsters. The Funds are "multiemployer plans" as defined in ERISA, 29 U.S.C. § 1002(37), *i.e.*, they are plans

(i) to which more than one employer is required to contribute,

(ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and

(iii) which satisfies such other requirements as the Secretary [of Labor] may prescribe by regulation.

The Funds are managed by a Board of Trustees (half appointed by the Teamsters, half by participating employers) and provide pension, hospital, medical, dental, death, and disability benefits. The Funds

are authorized by their creation agreements to "demand, collect, receive and hold employer contributions" and to take whatever steps are necessary "to effectuate the collection of such employer contributions." The trust agreement that created the Pension Fund states that the Pension Fund will "provide for the payment by such Employers to the [Pension Fund], periodically, a sum of money more nearly described in such collective bargaining agreements between [employers] and [the Teamsters]." The Health Fund agreement authorizes the Health Fund "to determine whether said employers are making ... payments to the Trustees of the amounts required by the aforementioned collective bargaining agreement."

### A. The Collective Bargaining Agreement

The relationship between UPS and the Teamsters is generally governed by the CBA, which has had different incarnations over time: 1979–1982, 1982–1985 (apparently extended to 1987), 1987–1990, 1990–1993, 1993–1997, and 1997–2002. The parties may execute amendments to change terms of the CBA, effective either (i) retroactively to the beginning of the CBA or (ii) effective August 1 of the following contract year. Every version of the CBA requires UPS to make contributions to the Funds in all geographic areas where UPS has Teamster employees.

### B. The Participation Agreements

The Funds use auditors to ensure that employer contributions comply with the Funds' rules and regulations as memorialized in one-page, boilerplate Participation Agreements. Each version of the UPS/Teamsters CBA has required UPS to sign these Participation Agreements, which the CBAs describe as "stipulation[s] ... setting forth the provisions relating to

the [Funds] and certifying that [UPS] has entered into a written agreement containing such provisions." The Participation Agreements recite that they are to "be signed and submitted for each subsequent Collective Bargaining Agreement" and are "effective as of the date of execution thereof," after which they "shall continue in full force and effect for the same term as the [CBA]." The Participation Agreements provide that "as a condition of participation" in the Funds, the employer is "bound by all the rules and regulations of the Fund[s]," and that "in the event there is any agreement between [the] employer and [the] Union that is contrary or inconsistent with the terms of the [Participation Agreement] or the rules of the [Funds], such inconsistent provisions shall be null and void and superseded by the terms of [the Participation Agreement]."

### C. The Eight–Hour–a–Day "Cap" on Pension Contributions

According to UPS, the CBA was not "completely overhauled" each period and most CBA renewals were not "full-blown negotiations"; instead the renewals were negotiated under the presumption that only the CBA provisions that the parties wanted to *change* were renegotiated. According to UPS, "[a]ll other CBA provisions that were not changed in the negotiations automatically carried over and remained effective in the next CBA." Appellant's Brief at 10.

The 1979–1982 CBA included the following provision related to contributions to the Pension Fund by UPS:

Effective 5/1/79, the Employer agrees to contribute the sum of $1.025 per hour paid to any and all of his employees covered by this Agreement but *not to exceed a maximum of eight (8) hours per day or forty (40) hours per week, $41.00.*

Effective 5/1/80, the contribution shall be $1.15 per hour, *not to exceed a maximum of eight (8) hours per day or forty (40) hours, $46.00 per week.*

Effective 5/1/81, the contribution shall be $1.275 per hour, *not to exceed a maximum of eight (8) hours per day or forty (40) hours, $51.00 per week* (emphases added).

The negotiator for UPS testified that there were no negotiations related to the deletion of the eight-hour-a-day cap. Nevertheless, this eight-hour-a-day cap language was omitted in the text of the subsequent CBA version for 1982–1985 (which was apparently extended to 1987). The only limit on contributions in the 1982–1985 CBA was the following:

Effective April 1, 1982, the Employer agrees to contribute the sum of seventy-seven and one half cents ($.77½) per hour paid to any and all of its employees covered by this Agreement, *but not to exceed thirty-one dollars ($31.00) per week* .... Employer also agrees to contribute the sum of ninety cents ($.90) per hour paid to any and all of its employees covered by this Agreement, *but not to exceed thirty-six dollars ($36.00) per week* .... These payments may be made in a combined total of sixty seven dollars ($67.00) by one check payable to the [Pension Fund] (emphases added).

UPS contends—and the Funds do not deny—that the removal of the eight-hour-a-day cap language from the 1982–1985 CBA was an inadvertent deletion. In 1987, the Teamsters proposed a change to the CBA which would have provided that UPS "make contributions on *all* hours worked and/or paid, including overtime and shall increase contribution rates $.50 per hour per year (emphasis added)" but this proposal was withdrawn. The 1987–1990 version of the CBA provided that:

Effective April 1, 1987, the Employer agrees to contribute the sum of seventy-seven and one half cents ($.77½) per hour paid to any and all of its employees covered by this Agreement, *but not to exceed thirty-one dollars ($31.00) per week* .... Employer also agrees to contribute the sum of one dollar and ninety-eight cents ($1.98) per hour paid to any and all of its employees covered by this Agreement, *but not to exceed seventy-nine dollars and twenty cents ($79.20) per week* .... These payments may be made in a combined total of one hundred ten dollars and twenty cents ($110.20) by one check payable to the [Pension Fund] (emphases added).

In 1989, UPS, the Teamsters, and the Pension Fund collectively attempted to resolve a variety of disputes concerning contributions made to the Pension Fund between January 1, 1975 and December 31, 1986. As part of this resolution, UPS and the Teamsters executed a Settlement Amendment to the 1987–1990 CBA ("the 1989 Amendment") that expressly restored the eight-hour-a-day cap to the CBA by amending the 1987–1990 version of the CBA to read as follows:

Effective August 1, 1987, the Employer agrees to contribute the sum of $2.755 per hour paid to any and all of its employees covered by this Agreement, *but not to exceed a maximum of eight (8) hours per day or forty hours per week, $110.20* (emphasis added).

Simultaneously, UPS and the Pension Fund entered into a Settlement Agreement ("the 1989 Agreement") that governed how the Pension Fund would adjust or subordinate its collection rules to accommodate the 1989 Amendment, as follows:

The Funds will not increase [UPS's] contribution obligation directly or indirectly by making or interpreting rules or Participation Agreements in a manner directly contrary to the Company's collective bargaining agreement. Moreover, *it is agreed that [UPS] is not obligated to make ·contributions for any hour paid to an employee in excess of either eight hours per day or forty hours per week* (emphases added).

But the effect of the 1989 Agreement was expressly limited to correspond to the duration of the 1987–1990 CBA:

The Funds and [UPS] agree that *the audit principles* applied in reaching this Agreement *will govern [UPS's] obligation to the Funds during the period January 1; 1987 through the expiration date of the current collective bargaining agreement (July 31, 1990)* notwithstanding any provision of the Participation Agreements or rule of the Funds which might appear to be in conflict with the terms and principles of this Agreement (emphasis added).

For some unspecified reason, none of the CBAs executed after July 31, 1990 included the eight-hour-a-day cap language.[2] Even so, UPS and the Teamsters

**2.** The relevant text from the 1990–1993 version of the CBA simply states that:

Effective August 1, 1990, the Employer agrees to contribute the sum of three dollars and fifty and one half cents ($3.505) per hour paid to any and all of its employees covered by this Agreement, *but not to exceed one hundred forty dollars and twenty cents ($140.20) per week* (emphasis added).

The relevant text from the 1993–1997 version of the CBA states that:

Effective August 1, 1993, the Employer agrees to contribute the sum of three dollars and sixty-nine and one half cents ($3.695) per hour paid to any and all of its employees covered by this Agreement, *but not to exceed one hundred forty-seven dollars and eighty cents ($147.80) per week* (emphasis added).

negotiated as though the cap was in effect. Thus the Teamsters proposed in 1993 and again in 1997 to change the CBA to obligate UPS to make contributions on all hours worked, including overtime. These proposals were all eventually withdrawn by the Teamsters.

## D. The Conduct of the Parties after 1989

Regardless of other understandings between UPS and the Teamsters after July 31, 1990, the Participation Agreements distributed by the Funds to UPS and its other contributing employers provided for a *weekly* cap on employer contributions (which, according to the Funds, was consistent with the text of the collective bargaining agreements of *all* Teamster employers that participated in the Funds). Until 1991 UPS duly signed these Participation Agreements. In 1991, however, UPS's Regional Labor Relations Manager, Gerald Nerone, began adding the phrase "subject to contract" when he signed the Participation Agreements associated with the 1990–1993 CBA. The Pension Fund accepted the Participation Agreements with Nerone's notation. Beginning in 1992, UPS refused altogether to execute the Participation Agreements tendered by the Pension Fund, but continued to make the contributions that UPS believed it owed pursuant to its (now unwritten) understanding with the Teamsters.

When, from 1995 to 1997, the Funds' auditors examined UPS's records, they found substantial delinquent contributions, and statutory penalties, for the period from January 1989 to December 1994:

$2,878,506 to the Pension Fund, and $457,008 to the Health Fund. Included in these audit estimates were disputed contributions in respect of pay exceeding the alleged eight-hour-a-day cap, as well as contributions that allegedly should have been made to both Funds in respect of unused sick leave, holidays and roving holidays, vacations, used sick leave, workers compensation and disability, orientation, jury duty, funeral leave, and military leave.

## E. District Court Proceedings

The Funds commenced this suit, claiming delinquent contributions from UPS under Section 515 of ERISA, 29 U.S.C. § 1145 ("Section 515"), which provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

*Id.* Violations of Section 515, along with the other provisions of ERISA, are enforceable through civil actions brought under 29 U.S.C. § 1132.

Initially, the Funds claimed delinquent contributions allegedly owed by UPS between January 1989 and December 1994. However, at the summary judgment stage of the case, the Funds stipulated the Pension Fund was *not* entitled to any contributions in excess of the eight-hour-a-day cap for the period between January 1, 1989 and July 31, 1990, when the 1989 Agree-

---

The relevant text from the 1997–2002 version of the CBA states that:
> Effective August 1, 1997, the Employer agrees to contribute for paid hours to any or all of its employees covered by this Agreement, *but not to exceed the maximum contributions per week.*

---

Effective August 1, 1997, the Employer also agrees to contribute for paid hours to any or all of its part-time employees covered by this Agreement, *but not to exceed the maximum contributions per week* [based on hourly contribution rates for 1997, 1998, 1999, 2000, and 2001] (emphases added).

ment was (indisputably) in effect. *See N.Y. State Teamsters Conference Pension & Retirement Fund v. UPS,* 198 F.Supp.2d 188, 191 n. 2 (N.D.N.Y.2002) (hereinafter *"N.Y. State Teamsters "*).

After an exhaustive review of the contracting history of UPS and the Teamsters, the district court found that an implied eight-hour-a-day contribution cap was an unwritten but understood provision of the CBA, *id.* at 197, but that under Section 515 of ERISA the rules and regulations in the Participation Agreements supersede the provisions in the CBA. *Id.* at 199. The district court also found that the estimates by the Funds' auditors as to the contributions owed to the Funds by UPS were reasonable and that UPS's counterclaim against the Funds for reimbursement for a variety of past contributions was therefore invalid. *Id.* at 200–11.

## Discussion

In cases where an action has been tried in the district court without a jury, we review findings of fact with great deference and do not set them aside unless they are clearly erroneous. *AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 208–09. (2d Cir.2000). The district court's legal conclusions are reviewed *de novo,* as are mixed questions of law and fact. *Id.*

## I

Section 515 requires participating employers to make pension contributions in accordance with the terms of the multiemployer plan or the terms of the CBA, but does not say explicitly how to resolve a conflict between the two arrangements. The district court observed that the following text appears in the Participation Agreements distributed by the Funds:

> [I]n the event there is any agreement between [the] employer and [the] Union that is contrary or inconsistent with the

terms of the [Participation Agreements] or the rules of the [Funds], such inconsistent provisions shall be null and void and superseded by the terms of [the Participation Agreements].

Relying heavily on an earlier case from the Western District of New York, the district court concluded that the Participation Agreements—which it characterized as "trust provisions"—"are to govern when in conflict with contrary provisions in a collective bargaining agreement." *N.Y. State Teamsters,* 198 F.Supp.2d at 199 (quoting *Truckmen's & Warehousemen's Ass'n of Rochester v. N.Y. State Conference Pension & Retirement Fund,* 751 F.Supp. 351, 358 · (W.D.N.Y.1990)) (emphasis omitted).

We think that the district court's conclusion giving controlling and superseding effect to the Participation Agreements may be an overstatement. We also disagree with the district court's characterization of the Participation Agreements as "trust provisions." Instead, we think that the function of participation agreements like the ones in this appeal is to facilitate the administration of contribution collections— not to serve as an alternative source for collective bargaining terms.

Multiemployer plan participation agreements (i) "set forth certain rules and procedures for the making of contributions to [multiemployer plans]" and (ii) set out the standards that govern audits of employers by multiemployer plans. *Building Trades Employers Assoc. v. New York State Teamsters Conference Pension & Retirement Fund,* 761 F.2d 115, 116 (2d Cir. 1985) (per curiam). Thus an employer who "enter[s] into a 'participation agreement'" with a multiemployer plan is only "assent[ing] to all actions taken by the plan trustees *within the scope of [the trustees'] authority in administering the plan."* *New York State Teamsters Conf. Pension & Retirement Fund v. Boening*

*Bros.*, 92 F.3d 127, 131 (2d Cir.1996) (citing *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985)) (emphasis added).

The Participation Agreements at issue, true to type, state that "as a condition of participation" in the Funds the employer is "bound by all the *rules and regulations* of the Fund[s]" (emphasis added). In short, the Participation Agreements distributed by the Funds operate as acknowledgments by UPS of the rules and regulations that govern contributions to the Funds, particularly in the event of a future audit.[3]

■ As we observed in *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir.1990), other circuits "have unanimously regarded [Section 515] as a limitation on the defenses available to an employer when sued by an employee benefit plan," and have repeatedly barred employers from invoking as a defense an oral or otherwise unwritten agreement with the union "not to enforce the [written] terms of the collective bargaining agreement" with respect to multiemployer plan contributions.[4] *Id.* Persuaded by the reasoning

of these cases from other circuits, we now hold that otherwise valid collection regulations promulgated by a multiemployer plan to effectuate contributions cannot be defeated by implied or unwritten agreements between employers and unions.

There are a variety of important rationales for such a rule, including the evident legislative intent behind Section 515, *see, e.g., Gerber Truck*, 870 F.2d at 1152 (reviewing the legislative history of Section 515); the depletion of pension funds that would result if multiemployer plans were routinely forced to collect contributions via litigation, *see id.* at 1151–52; and the facilitation of future audits. Multiemployer plans should be able to ascertain the controlling provisions of a CBA by reading it, without interviewing the negotiators or tracing provisions back to CBAs that have expired. Moreover, this rule—like the common-law parol evidence rule—gives the employer a salutary incentive to memorialize any unwritten understanding with the union concerning pension contributions, affords an easy way to enforce legislative protections of negotiated rights, and assures that multiemployer plans and their auditors will not become unwilling

---

3. UPS attaches great significance to its initial decision to sign the Funds' Participation Agreements "subject to contract" in 1991 and to refuse to sign the Participation Agreements altogether in subsequent years. We are unimpressed with the legal significance of this decision by UPS. As the district court noted, UPS had signed previous Participation Agreements that bound it to "all the rules and regulations of the Fund[s] now and/or *hereinafter adopted* by the [Funds]." More importantly, UPS executed every CBA version that it negotiated with the Teamsters and each version of the CBA specifically required UPS to "execute stipulation[s] . . . setting forth the provisions relating to the [Funds] and certifying that [UPS] has entered into a written agreement containing such provisions."

4. *See Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118

F.3d 1018 (4th Cir.1997); *Cent. States, Southeast & Southwest Areas Pension Fund v. Independent Fruit & Produce Co.*, 919 F.2d 1343, 1353 (8th Cir.1990) ("Given the purpose of written contracts and section 515 of ERISA, the parties to a collective bargaining agreement are bound by the terms of their agreement, regardless of their undisclosed intent."); *see also Cent. States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Svc., Inc.*, 870 F.2d 1148, 1149 n. 1 (7th Cir.1989) (*in banc*) (collecting the "unanimous" views of the Third, Sixth, Ninth, Tenth, Eleventh and D.C. Circuits and concluding that a multiemployer plan is "entitled to enforce the writing [of an employer agreement or CBA] without regard to understandings or defenses applicable to the original parties") ("*Gerber Truck*").

arbitrators in disputes arising from unwritten understandings between employers and unions.

▮▮ UPS argues that it had no obligation to document the eight-hour-a-day cap in subsequent versions of the CBA because the 1989 Amendment implicitly carried over into all subsequent versions of its CBA with the Teamsters. Our holding precludes such an argument. The policies of Section 515 require that multiemployer plans be able to rely on the plain text of CBAs. Otherwise, as this case illustrates, multiemployer plans could become enmeshed in years of controversy concerning alleged unwritten agreements between employers and unions. Such troublesome disputes could easily be obviated by documenting such allegedly uncontroversial understandings in the express text of CBAs.

UPS also argues that, since the Pension Fund was a party to the 1989 Agreement, it cannot honestly claim that it was ignorant of the existence of the eight-hour-a-day cap. This argument is unavailing: Paragraph 3 of the 1989 Agreement states "that the audit principles ... in ... this Agreement will govern [UPS's] obligation to the Funds *during the period January 1, 1987 through the expiration date of the current collective bargaining agreement (July 31, 1990)* "—a period as to which the Pension Fund has already stipulated it is respecting the existence of the eight-hour-a-day cap. No doubt, the 1989 Agreement may have put the Pension Fund on some notice that the cap might continue in some form; but it is our holding that such notice is immaterial in the absence of a writing— furnished to funds or their auditors—that provides for such a cap.

We need not reach the broader holding on which the district court relied: that a participation agreement supersedes and controls all terms of a CBA, written or unwritten. This holding is at least in tension with the strong traditional labor policy in favor of collective bargaining that is promoted in the National Labor Relations Act, 29 U.S.C. § 151. Moreover, in this case, this particular aspect of the district court's opinion was overtaken by our opinion in *La Barbera v. J.D. Collyer Equipment Co.*, 337 F.3d 132, 137–39 (2d Cir. 2003), which held that the rulemaking authority of a multiemployer plan is limited by the terms of the plan's creation documents.

Here, the trust agreement that created the Pension Fund conferred a limited authority on the Pension Fund to adopt "rules and regulations" that are not "inconsistent with the terms" of the trust agreement, one of which (Section 11(h) of the Pension Fund trust agreement) authorizes the Pension Fund to collect "sum[s] of money more nearly described in such collective bargaining agreements between [employers] and [the Teamsters]." Similarly, Section 2 of the Health Fund trust agreement authorizes the Health Fund to audit the collection of "the amounts required by the aforementioned collective bargaining agreement." Thus, the documents that created the Funds did not give them the power to use their rules and regulations to supersede the written terms of CBAs, and we have no reason to consider whether some other, more broadly empowered multiemployer plan could claim or exercise such a rulemaking power.

## II

The district court rejected all challenges to the auditors' estimates of delinquent UPS contributions. The court found that the auditor estimates were soundly based either on valid rules promulgated by the Funds or on reasonable application of the Funds' rules to UPS by the auditors. *N.Y. State Teamsters*, 198 F.Supp.2d at 200–11. The court's approach was properly defer

ential to the rules, regulations, and collection methodologies used by multiemployer plans and their auditors:

> In order to avoid excessive judicial interference with pension plan administration, the federal courts of appeals generally have applied an "arbitrary and capricious" standard of review in actions challenging the decisions of plan administrators. We have stated that the lawful, discretionary acts of a pension committee should not be disturbed, absent a showing of bad faith or arbitrariness. Where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious.

*Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Ben. Plan,* 698 F.2d 593, 599 (2d Cir.1983).

■ At the threshold, UPS contends that the audits were invalid because they were based on Participation Agreements that UPS did not execute. However, since the obligation of UPS to make payments to the Pension Fund derives from the CBA and not the Participation Agreements and since UPS did not object to being audited by the Pension Fund as provided for in the Participation Agreements, we are unimpressed with this argument. Next, UPS complains that the auditors' methodologies ignored the understandings reached in the 1989 Agreement over how the Funds' rules and regulations would be applied during an audit; however, the limited duration of the 1989 Agreement had expired before the years for which the Funds are currently seeking contributions.

Having dispensed with these arguments, we will review UPS's two primary remaining complaints about the audit findings.

### A. Auditor Estimates of Unused Sick Leave Contributions

■ UPS argues that it was not obligated to make Pension Fund contributions for unused sick leave if the unused sick leave was paid in a week in which the Pension Fund beneficiary worked forty hours—i.e., a week in which (under the express wording of all the CBAs) the contributions had reached the dollar cap—whereas the Pension Fund argues that UPS owed Pension Fund contributions for all unused sick leave. The CBA required UPS to compensate its employees for any unused sick leave from the previous year,[5] but no clear guidance appears in either the CBA or the Pension Fund rules for how benefit contributions should be allocated with respect to such unused sick time.

Lurking not far in the background is the Funds' suspicion—possibly shared by the district court, *see N.Y. State Teamsters,* 198 F.Supp.2d at 202—that UPS might deliberately evade its obligation to contribute with respect to unused sick leave by paying unused sick leave time whenever possible during weeks in which Pension Fund beneficiaries have already worked forty hours. In light of the fairly specific provisions in the CBA that govern the timing of unpaid sick leave pay, this suspi-

---

**5.** The precise language of the unused sick leave provisions varied slightly between the 1990–1993, 1993–1997, and 1997–2002 CBA versions. The 1990–1993, 1993–1997 and 1997–2002 CBA versions all provided that "unused sick time shall be paid to the employee the first payroll period following Christ- mas, or such other time as the employees may request" in a calendar year. In addition, the 1990–1993 CBA version gave employees the option to carry over unpaid sick leave after Christmas, in which case it had to be used or it would be paid during "the first payroll period in May."

cion of possible future manipulation by UPS strikes us as overstated.

The auditors' approach was to ascertain whether each Pension Fund beneficiary at UPS had worked 2,080 hours per year (*i.e.* 40 hours per week X 52 weeks per year), and, if not, to allocate any unused sick leave time to weeks in which the employee had worked fewer than forty hours. In crafting this approach, the auditors relied upon a variety of memoranda circulated by various Pension Fund officials in 1986, 1987, and 1990 and upon minutes from the meetings of Pension Fund officials.

Citing our holding in *La Barbera,* 337 F.3d at 132, UPS argues that the auditors' approach exceeded the rulemaking power of the Pension Fund because their methodology was not authorized explicitly in the Pension Fund's creation documents. As UPS reads the trust agreement that created the Pension Fund, the provision that gives the Pension Fund "the power to make rules and regulations not inconsistent with the terms hereof to carry out the provisions hereof" contemplates (in UPS's terms) only "internal, housekeeping matters that do not extend to employer contribution issues." Appellant's Brief at 38. We read the rulemaking powers vested in the Pension Fund by its trust agreement as extending much further than merely "internal, housekeeping matters" and quite clearly encompassing the collection of employer contributions.[6]

In any event, UPS's reliance on *La Barbera* is misplaced. In *La Barbera,* a multiemployer plan passed a collection rule that required all employers that were wholly owned by a beneficiary of the multiemployer plan to make benefit contributions for the beneficiary (or any relatives of the beneficiary) for 160 labor hours each

month, regardless of how many hours the beneficiary had actually worked. *Id.* at 135. We held that this "draconian" rule was invalid because it (i) far exceeded the multiemployer plan's power under its trust agreement to "estimate" hours worked by a plan beneficiary, and (ii) explicitly contradicted the written terms of the CBA. *Id.* at 134. The employers in *La Barbera* pointed to a written provision of the CBA that is expressly contradicted by the auditors' method for estimating contributions for unused sick leave pay. UPS cannot do that. We agree with the district court that the auditing approach of the Fund did not exceed the Pension Fund's rulemaking authority under the trust agreement.

## B. Auditor Estimates of Disability Contributions

■ Under the Health Fund rules, an employer owes retroactive contributions from the date of an illness or injury, but only if the Health Fund beneficiary has provided notice to the employer within ten days of the onset. To determine retroactive Health Fund contributions for UPS employees, the auditors consulted internal UPS records that listed employees on disability leave without indicating when (if ever) the employee gave UPS notice of the disability. For that reason, UPS argues that the auditors' sole reliance on UPS's internal records to determine contributions for employees on disability leave was based on a "faulty assumption." Appellant's Brief at 47.

The district court ruled that it was reasonable for the auditors to rely on UPS's own internal records to estimate contributions for workers compensation and disability: "it was logical for the auditors to

---

6. For example, Paragraph 2 of the Pension Fund trust agreement gives its Trustees the "power to demand, collect, receive, and hold Employer contributions and take such steps ... as may be necessary or desirable to effectuate the collection" of such contributions.

do so because UPS, as the employer, was responsible for maintaining those records." *Id.* at 208. UPS does not suggest another source of information that might have corrected this "faulty assumption" by the auditors; we therefore see no error in the district court's finding that this audit methodology was reasonable.

The UPS counterclaim alleges that, based on earlier understandings with the Funds, it is entitled to reimbursement for contributions collected for UPS employees who were on disability for a non-work-related injury lasting less than eight days. The district court found that, regardless of whether UPS was entitled to reimbursement for such contributions, the Funds' auditors "did not [intentionally] assess UPS for employees who were absent due to injury or illness for less than eight days." *Id.* at 208 n. 28. In any case, the district court found that UPS's internal records made it impossible for auditors to determine which UPS employees were on disability leave for less than eight days. *Id.* at 208. We see no clear error in either of these findings by the district court and therefore, like the district court, we reject UPS's counterclaim as factually unsupported.

We have considered UPS's remaining arguments, including its claims that the district court abused its discretion in excluding the testimony of a witness during trial and its assertions that the Funds erroneously collected contributions for employee orientation and holidays. None of these claims has merit.

\*　　\*　　\*　　\*　　\*　　\*

For the foregoing reasons, the judgment of the district court is affirmed.